# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

STEPHEN J. BROWN,

         Plaintiff,

    v.                                Case No. C-1-04-164

UNIVERSITY OF CINCINNATI,

         Defendant.

## ORDER

This matter is before the Court upon defendant's motion for summary judgment (doc. 18), plaintiff's opposing memorandum (doc. 21), and defendant's reply (doc. 24).

### I. Introduction

Plaintiff filed this action against defendant University of Cincinnati (UC) on February 25, 2004. He invokes the Court's jurisdiction under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132; the Rehabilitation Act, 29 U.S.C. §§ 701-794; and 42 U.S.C. § 1983. Plaintiff also seeks to invoke the Court's supplemental jurisdiction over claims that he brings under Ohio law.

Plaintiff makes the following allegations in the complaint: On or about February 1, 2002, plaintiff was enrolled in his final year at UC's College of Medicine. Plaintiff had been attending Medical School for over five years and had encountered difficulty in passing written, multiple

1

choice, and essay tests while performing average and better than average on clinicals and oral exams. Plaintiff was informed by his professors and defendant's agents that if he failed the OB/GYN course, he could be dismissed from the Medical School, even though he had passed clinical exams in the same area.

On or about January 15, 2002, plaintiff was referred by UC's University Health Services to the Psychological Services Center at UC. He was referred for psychological testing for the purpose of evaluating why plaintiff was unable to do well on written exams and had not passed the written part of his OB/GYN course. Plaintiff was evaluated between January 15 and February 15, 2002. On February 15, 2002, defendant, through the Psychological Services Center, prepared a report, summary, and recommendation finding that plaintiff had a reading disorder and should request extended time for tests of at least 1 ½ to 2 times more than the maximum time allowed. A finding was also made that plaintiff had a generalized anxiety disorder.

Plaintiff, upon first being advised of any type of reading disorder that affected his ability to take standardized written tests, notified his professors and the Appeals Division of the Medical School and requested an accommodation to retake the OB/GYN written test and other required course work. On or about February 28, 2002, plaintiff was denied any accommodation to retake the written test and other course work and was dismissed from the Medical School with no further appeals. Plaintiff continued to request some accommodation after being dismissed from Medical School. On October 23, 2003, plaintiff, through counsel, requested an investigation by the Medical School for the purpose of reinstating plaintiff and allowing him to continue to pursue his medical degree.

2

While a student at the Medical School, plaintiff was given a four-year merit scholarship in order to fulfill financial requirements.  UC receives federal funds for programs for medical students, federal funds available for partnerships to enhance post-secondary education for individuals with disabilities, and federal funds through Medicare and Medicaid for patients who are seen by third and fourth-year medical students.

Plaintiff was diagnosed with a disability as defined under pertinent federal laws; he requested an accommodation prior to his dismissal from Medical School, which he needed in order to meet the standards set by defendant; and due to his disability, he was not given enough time to complete written exams, although he needed the accommodation to meet the standards set by defendant and even though defendant has the discretion to allow plaintiff to continue on to receive his medical degree.

Based on these allegations, plaintiff asserts claims that (1) he was discriminated against and treated differently due to his disability when he was not given an accommodation; (2) he was denied benefits that were made available to UC for individuals with disabilities, which caused plaintiff to be dismissed from Medical School; (3) defendant breached a contract with plaintiff by refusing to accommodate him in violation of defendant's own regulations and promises to medical students that they would be treated fairly and given an accommodation if the students had a disability and requested an accommodation; (4) UC breached its obligations under guidelines set by the federal government to use federal funds for students with disabilities for post-secondary education; and (5) defendant, through its actions, violated both Ohio and federal law regarding accommodations by a public institution for those individuals with a disability and breached the public policy of Ohio.

3

Plaintiff requests injunctive relief requiring the University to reinstate him to Medical School as a fourth-year student, permitting him to graduate; to accommodate plaintiff's disabilities and allow him to take any written exams or other tests; to reinstate his scholarship funds; and to pay reasonable costs and attorney fees.

## II. Summary judgment motion

Defendants move for summary judgment on all claims against them.  Defendants argue that (1) plaintiff's claim under 42 U.S.C. § 1983 fails on its face because the University is not a person under the statute and is immune from claims under it; (2) the Court is without jurisdiction to consider plaintiff's state law claims; and (3) plaintiff's disability claims under both Title II of the ADA and § 504 of the Rehabilitation Act fail as a matter of law.

## III. Undisputed facts

1.  Plaintiff Stephen J. Brown entered UC's College of Medicine in the fall of 1996 after earning his high school and undergraduate degrees.  Plaintiff was an excellent student in high school and college.

2.  Plaintiff attended Rossford High School in the Toledo, Ohio area, graduating in 1992 in the top ten percent of his class with a 3.62 grade point average (GPA).  Throughout high school, plaintiff took honors courses in biology, chemistry, physics, English, and math.

3.  Plaintiff was not diagnosed with a learning disability or a reading disorder in high school and never requested any accommodations, such as extra reading time on examinations.

4.  While in high school, plaintiff took the ACT, a standardized college entrance test, and scored a 25 out of 36.  At that time, the national average ACT score was 20.6.  He did not request any extra time or any other accommodation on that examination.

4

5.    After high school, in the fall of 1992, plaintiff enrolled at Bowling Green State
      University (BGSU) in Bowling Green, Ohio.  He was in the honors program at BGSU,
      which required a minimum GPA and ACT score as well as recommendations from his
      high school instructors.  He received a number of academic honors and scholarships.

6.    Plaintiff was selected for membership in the Golden Key National Honor Society, an
      honor society which requires a certain GPA for admission, as well as in the Mortar Board
      National Honor Society, which focuses on GPA and extracurricular activities.

7.    Plaintiff graduated from BGSU in the spring of 1996 with a Bachelor of Science Degree
      in chemistry with a minor in biology.  He had a cumulative 3.46 GPA.

8.    Plaintiff was not diagnosed with any type of learning disability while at BGSU and did
      not request any accommodations on any of his examinations there.

9.    Plaintiff took the Medical College Admission Test (MCAT) to be considered for
      admission to medical school.  He did not request any accommodations, such as additional
      time, on either occasion that he sat for the MCAT.

10.   In the fall of 1995, plaintiff was accepted as a student at UC's College of Medicine.  He
      entered the College of Medicine as a first-year student in the fall of 1996.

11.   UC awarded plaintiff a scholarship that covered one-half of his tuition.  That scholarship
      was reserved for students who had demonstrated, among other qualities, "outstanding
      academic achievement."

12.   As was required of all of UC's first-year medical students, plaintiff signed the school's
      Admissions and Graduation Standards, which set forth the minimum grade requirements
      for staying enrolled at, and graduating from, the College of Medicine.

5

13. Those standards required a student to pass at least four of six first-year courses by the last day of exams in the spring quarter of 1997.

14. Plaintiff failed to meet those requirements. For his six first-year courses, his grades were two "remediates," one "failure," two "withdrawal pass," and one "withdrawal."

15. A "remediate" grade (R) is given to a student whose performance is below the minimum requirements for a passing grade, but who is not clearly failing. It is not a passing grade, but a student is permitted to repeat the portion of the course that is below passing without repeating the entire course.

16. A "failing" grade (F) reflects performance in a subject that is clearly below departmental passing standards.

17. A "withdrawal" (W) means that a student withdrew from a course without completing any graded coursework.

18. A "withdraw pass" (WP) means that a student withdrew from a course after having completed the graded coursework to that point at a passing level.

19. When plaintiff failed to meet the minimum grade requirements to continue in his studies, the College of Medicine's Promotion Board convened in the spring of 1997 to discuss his academic progress and the possibility of his dismissal from school.

20. Plaintiff personally appeared before the Promotion Board and gave the Board three personal reasons for his poor performance.

21. Plaintiff did not tell the Promotion Board that he had, or might have, a learning disability or reading disorder, and he did not request any type of accommodation.

6

22.    The Promotion Board recommended that plaintiff be dismissed from the College of
       Medicine.

23.    Plaintiff appealed that decision to an Academic Appeals Board, and he personally
       appeared before the Appeals Board on April 29, 1997.

24.    Plaintiff gave the Appeals Board the same three reasons for his poor performance that he
       had given to the Promotion Board.  Plaintiff made no mention of a learning disability,
       reading disorder, or a request for accommodations.

25.    The Appeals Board decided to give plaintiff another chance, and the Dean of the College
       of Medicine, who had the authority to overrule or affirm the Appeals Board's decision,
       agreed, reinstating plaintiff to the College of Medicine.

26.    Plaintiff was permitted to repeat the entire first-year curriculum.  He did so in the 1997-
       98 school year, receiving passing grades in five courses and a high pass in his sixth
       course, Introduction to Clinic Practice I.

27.    In 1998, plaintiff had a conversation with Dr. Dorothy H. Air, the Assistant Dean of
       Student Affairs, during which he raised the possibility of getting tested for a reading
       disorder.

28.    At the time of his conversation with Dr. Air, plaintiff had not been diagnosed with any
       type of learning disability.

29.    Plaintiff continued to the second-year schedule of classes in the 1998-99 school year,
       where he received four passing grades and a high pass in his psychiatry course.

30.  Plaintiff had not been diagnosed with any type of learning disability, nor did he request any accommodations, during the first two years of Medical School.  He received the grades he did by working hard.

31.  With the second year completed, plaintiff was permitted to advance to the third-year program.

32.  UC required of all its students that they pass Step I of the United States Medical Licensing Examination (USMLE) in order to continue in their third-year studies.  The USMLE is a standardized test administered by the National Board of Medical Examiners.

33.  Plaintiff sat for Step I in June of 1999, but he did not pass.

34.  When plaintiff received his failing grade on the examination, UC permitted him to put his regular coursework on hold and concentrate on studying for the Step I exam.

35.  Plaintiff took the Step I exam in October 1999, but he again failed to pass.  Plaintiff finally received a passing score on Step I in August 2000.

36.  During the time period between plaintiff's coursework and his passing Step I in August 2000, plaintiff did nothing but study for that exam.

37.  Upon passing the Step I exam, plaintiff was permitted to return to school.

38.  Over the course of the next three years, plaintiff received passing grades in all of his courses except for three.  Among the grades he earned were honors grades in his Neurology Specialty Clerkship and Forensic Psychology courses and a high pass in his Psychiatry Core Clerkship.

39.   Plaintiff received a "remediate" grade in his Pediatrics Core Clerkship and in his Internal Medicine Core Clerkship, and in October 2001, a failing grade in his OB/GYN Core Clerkship.

40.   Plaintiff understood that if a student initially receives two "R"s and an "F" during any given year of coursework, he is subject to dismissal.

41.   Plaintiff eventually remediated his Pediatrics and Internal Medicine grades, but he retained a failing grade in his OB/GYN Clerkship.

42.   Plaintiff made use of a grade grievance process whereby a student may dispute a grade that he or she receives, but the OB/GYN grade was upheld.

43.   Even though plaintiff remediated his Pediatrics and Internal Medicine grades, under the College's Academic Standards, he was still subject to dismissal if he retained the failing OB/GYN grade.  Plaintiff was aware that if the grievance process resulted in anything other than a passing grade in that subject, his dismissal from school would be recommended.

44.   Plaintiff appeared before the Promotion Board on January 22, 2002.

45.   The Promotion Board recommended plaintiff's dismissal.  That recommendation was confirmed in writing in a letter to plaintiff dated January 28, 2002.

46.   Plaintiff appealed the Promotion Board's decision to the Academic Appeals Board.

47.   After plaintiff's dismissal from the College of Medicine had been recommended, plaintiff was diagnosed on February 15, 2002, by the Psychological Services Center at UC as having a reading disorder and a generalized anxiety disorder.

48. The report by the Psychological Services Center recommended, among other things, that plaintiff be given extra time on exams and that he be permitted to take them in a distraction-free environment.

49. Plaintiff disclosed his diagnosis to a handful of doctors associated with the College of Medicine between February 15, 2002, the date of his diagnosis, and February 26, 2002, when he appeared before the Academic Appeals Board for the second time in his career at the College of Medicine.

50. Plaintiff told the Appeals Board of the diagnosis he had received from the Psychological Services Center.

51. The Appeals Board upheld the Promotion Board's recommendation of plaintiff's dismissal from the College of Medicine, and the Appeals Board's decision was affirmed by the Dean in early March of 2002.

52. Prior to his appearance before the Appeals Board, plaintiff had not requested any accommodation from anyone associated with the College of Medicine based on the diagnosis he had received from the Psychological Services Center.

53. In August of 2004, plaintiff was evaluated by Dr. Christopher Layne. Dr. Layne found that plaintiff's failure to pass standardized tests was due to his reading disorder. The opinion of Dr. Layne was based upon the report from UC's Psychological Services Center and Dr. Layne's examination of plaintiff.

54.     Dr. Layne opined that plaintiff's mental impairment, his reading disorder, substantially

        limits the major life activity of learning.  Dr. Layne opined that if plaintiff would have

        been given the accommodations of more time to take tests, a distraction-free

        environment, and other accommodations recommended by the UC Psychological

        Services  Center, plaintiff would have been able to pass the written portion of the

        OB/GYN tests and other courses that he had failed.

55.     Plaintiff scored in the 1 percentile in neuropsychological functioning of roughly one out

        of a thousand peers [presumably on tests administered by Dr. Layne], and only two or

        three out of a thousand peers were worse off neursopsychologically.

### IV. Oral argument

The Court finds that oral argument is not necessary in this case.  The applicable law is

well-developed, the factual issues involved in the case are not complex, and the factual and legal

issues have been fully briefed by the parties. Pursuant to Rule 7.1 of the Local Rules of the

United States District Court for the Southern District of Ohio, the matter will therefore be

decided based upon the parties' memoranda.

### V. Summary Judgment Standard

Fed. R. Civ. P. 56 allows summary judgment to secure a just and efficient determination

of an action.  This Court may only grant summary judgment as a matter of law when the moving

party has identified, as its basis for the motion, an absence of any genuine issue of material fact.

***Celotex Corp. v. Catrett***, 477 U.S. 317, 327 (1986).

The party opposing a properly supported motion for summary judgment "may not rest

upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing

11

that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)

(quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)). The evidence of

the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor.

*Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)).

 The court is not to weigh the evidence and determine the truth of the matter but is to

decide whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. There is no

genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury

to return a verdict for that party. *Id.* at 249 (citing *Cities Serv.*, 391 U.S. at 288-289). If the

evidence is merely colorable, *Dombrowski v. Eastland,* 387 U.S. 82, 84 (1967), or is not

significantly probative, *Cities Serv.*, 391 U.S. at 290, judgment may be granted. *Anderson*, 477

U.S. at 249.

## VI. Opinion

### A. Title II/Rehabilitation Act claim

### 1. Plaintiff's claim

 Plaintiff brings a claim under both Title II of the ADA and § 504 of the Rehabilitation

Act, alleging that "(1) [he] has a disability; (2) he is otherwise qualified, and (3) that he was

excluded from and denied benefits and was subject to discrimination solely because of his

disability." Plaintiff apparently relies on the regulations implementing the Rehabilitation Act in

support of his claim that he was denied benefits to which he was entitled under the Act. In his

memorandum in opposition to the motion for summary judgment, plaintiff includes a section

captioned, "Contrary to Defendant's Argument, the Plaintiff Stephen Brown is a handicapped

person pursuant to Section 504 of the Rehabilitation Act. Under Section [sic] 34 Code of

Federal Regulations, Section 104.3(C), the Rehabilitation Act includes Education of the Handicapped Act." Under that heading, plaintiff presents the following argument: Pursuant to § 104.3(f) of the Code of Federal Regulations, the "recipient" includes any political subdivision, and UC is a political subdivision. UC admits that it is federally funded. UC is therefore an entity covered by the Rehabilitation Act as set forth in CFR § 104.3(k)(2)(i). Under § 104.3(g), the "applicant for assistance" is one who submits a request, plan, or application to the Department Official. Plaintiff requested information from Dr. Air and an accommodation from the UC Appeals Board and Dr. John H. Hutton, Dean, and that request was ignored by Dr. Air and denied by Dr. Hutton. Specific learning disabilities are covered "by the Rehabilitation Act by regulations published under the Federal Guidelines." Title 34 CFR § 104.4 provides that no qualified handicapped person shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subject to discrimination under any program or activity that receives federal financial assistance. Discrimination includes denying a qualified handicapped person the opportunity to participate in, or benefit from, such financial assistance. Under 34 CFR § 104.4, UC was required to make academic modifications, including length of time permitted for completion of degree requirements, substitution of specific courses, and changes in the manner in which specific courses are conducted.

Plaintiff contends that there is a private right of action under "the statute" pursuant to *Cort v. Ash,* 422 U.S. 66 (1975), because the statute was enacted to grant accommodations to individuals with learning disabilities, and plaintiff is a member of the class for whose benefit the

statute was enacted[1]; the statutory language clearly did not deny a private cause of action; and the intent of Congress would be fulfilled by permitting a private right of action since the legislative scheme is to grant federal funds under certain sections of the "Educational Act" to the Medical School to serve those students who have learning disabilities. Plaintiff cites one federal court decision for the proposition that a private cause of action for breach of public policy and failure to grant funds to the plaintiff exists. *See DeJesus Chavez v. LTV Aerospace Corp.,* 412 F. Supp. 4 (N.D. Tex. 1976) (finding private right of action on behalf of student borrower under the Higher Education Act of 1965, 20 U.S.C. § 1071). Plaintiff also alleges that 34 CFR § 105.4 includes a compliance procedure for students to file a claim within 180 days with the Department of Education, but this information was never communicated to plaintiff, and such lack of notice is a waiver of defendant's position that plaintiff has no private right of action.

Plaintiff's claim is difficult to decipher, but it appears that plaintiff is claiming that UC violated § 504 of the Rehabilitation Act, 29 U.S.C. § 794, by denying him the benefit of federal aid that UC receives to assist students with disabilities. Plaintiff apparently claims that UC denied him benefits in violation of 34 C.F.R. § 104.4 by failing to modify the length of time permitted for plaintiff to complete his degree requirements, allow for the substitution of specific courses, and change the manner in which specific courses are conducted. The Court believes that plaintiff's claim under the Rehabilitation Act parallels his claim under the ADA, both of which are appropriately construed as a claim that UC discriminated against plaintiff on account of his alleged disability by denying him accommodations that were purportedly necessary for

---

[1] It is not clear whether plaintiff is referring to the Rehabilitation Act or the Education of the Handicapped Act (EHA). The Court notes that the latter Act was reenacted in 1990 as the Individuals with Disabilities Education Act.

14

him to successfully complete his course of studies at the College of Medicine. The Court will therefore set forth the law governing a claim of this nature and determine whether plaintiff has come forward with sufficient evidence to create a genuine issue of material fact on his disability discrimination claim under both the ADA and the Rehabilitation Act.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C.A. § 12132. The Rehabilitation Act provides, in pertinent part, that "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability . . . be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. § 794(a). Claims under the ADA and the Rehabilitation Act are largely the same, except that the defendant must receive federal funds in order to be liable under the Rehabilitation Act. *Kaltenberger v. Ohio College of Podiatric Medicine,* 162 F.3d 432, 436 n. 4 (6th Cir. 1998) (citing *McPherson v. Michigan High Sch. Athletic Ass'n, Inc.,* 119 F.3d 453, 459-60 (6th Cir.1997)).

To establish his claim that he was dismissed from the College of Medicine on account of his alleged disability in violation of the Rehabilitation Act and the ADA, plaintiff must show that "(1) [he] is handicapped or disabled as defined in each statute, (2) [he] is 'otherwise qualified' to continue in the program, and (3) [he] was dismissed from the program on the basis of [his] handicap or disability." *Id.* (citing *Andrews v. State of Ohio,* 104 F.3d 803, 807 (6th Cir.1997)).

In determining whether an individual is disabled, an individualized inquiry must be made and measures that mitigate the individual's impairment must be taken into account. *Cotter v.*

15

***Ajilon Servs., Inc.,*** 287 F.3d 593, 598 (6th Cir. 2002) (citing ***Sutton v. United Air Lines, Inc.,***

527 U.S. 471, 483 (1999)). An individual is considered "disabled" under the ADA if he:

> (A) [has] a physical or mental impairment that substantially limits one or more of
> the major life activities of such individual;
> (B) [has] a record of such an impairment; or
> (C) [is] regarded as having such an impairment.

42 U.S.C. § 12102(2).

> The regulations accompanying the ADA define a "physical or mental impairment" as,

> (1) Any physiological disorder, or condition, cosmetic disfigurement, or
> anatomical loss affecting one or more of the following body systems:
> neurological, musculoskeletal, special sense organs, respiratory (including speech
> organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and
> lymphatic, skin, and endocrine; or
> (2) Any mental or psychological disorder, such as mental retardation, organic
> brain syndrome, emotional or mental illness, and specific learning disabilities.

29 CFR § 1630.2(h).

> The term "substantially limits" is defined to mean,

> (i) Unable to perform a major life activity that the average person in the general
> population can perform; or
> (ii) Significantly restricted as to the condition, manner or duration under which an
> individual can perform a particular major life activity as compared to the
> condition, manner, or duration under which the average person in the general
> population can perform that same major life activity.

29 CFR § 1630.2(j)(1).

> The regulations define "major life activities" as "functions such as caring for oneself,

performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."

29 C.F.R. § 1630.2(i).  The regulations set forth the following factors to be considered in

17

determining whether an individual is "substantially limited" in a major life activity:

(i) The nature and severity of the [claimant's] impairment;
(ii) The duration or expected duration of the impairment; and
(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2).

The Supreme Court has stated that the terms "substantially limits" and "major life activity" must be "interpreted strictly to create a demanding standard for qualifying as disabled." ***Toyota Motor Manufacturing, Kentucky, Inc. v. Williams,*** 534 U.S. 184, 197 (2002). Any impairment that only moderately or intermittently prevents an individual from performing major life activities is not a substantial limitation under the ADA. ***Mahon v. Crowell,*** 295 F.3d 585, 590-91 (6th Cir. 2002).

A disabled person is "otherwise qualified" to participate in a program for purposes of a discrimination claim if he can meet the program's necessary requirements with reasonable accommodation. ***Kaltenberger,*** 162 F.3d at 435-36 (citing ***Sandison v. Michigan High Sch. Athletic Ass'n, Inc.,*** 64 F.3d 1026, 1034 (6th Cir.1995) (citing ***Doherty v. Southern College of Optometry***, 862 F.2d 570, 574-75 (6th Cir.1988)). Although a grantee of federal funds may have a duty to make reasonable accommodations, the grantee "need not be required to make 'fundamental' or 'substantial' modifications to accommodate the handicapped . . ." ***Kaltenberger***, 162 F.3d at 436 (citing ***Alexander v. Choate***, 469 U.S. 287, 300, 105 S.Ct. 712 (1985)). Specifically, the duty to provide reasonable accommodations does not require "an educational institution to lower or to effect substantial modifications of standards to accommodate a handicapped person." ***Id.*** (quoting ***Southeastern Community College v. Davis,*** 442 U.S. 397, 413, 99 S.Ct. 2361 (1979)).

18

A publicly-funded university is not obligated to provide an accommodation to a student under the ADA or the Rehabilitation Act until the student has provided a proper diagnosis of his claimed disability and has specifically requested an accommodation. *Id.* at 437; *see also Carten v. Kent State University,* 78 Fed.Appx. 499, 500-501, 2003 WL 22389657, *2 (6th Cir. 2003) (citing *Kaltenberger,* 162 F.3d at 437)). In *Kaltenberger,* prior to being diagnosed with ADHD, the plaintiff had told an academic counselor at the defendant college that she thought she might have the disorder. The counseling center had plaintiff evaluated and tested and found no clear evidence of a learning disability, but the center did offer her individual counseling. In addressing the plaintiff's assertion that the defendant had failed to reasonably accommodate her disability because it was involved in causing a delay in her eventual diagnosis of ADHD, the Sixth Circuit found that plaintiff's statement to the academic advisor that she thought she might have ADHD "simply did not impose an obligation to offer accommodations." *Kaltenberger,* 162 F.3d at 437. The Sixth Circuit in *Kaltenberger* cautioned that when reviewing the substance of academic decisions, courts "should show great respect for the faculty's professional judgment." *Id.* at 436 (citing *Regents of Univ. of Michigan v. Ewing,* 474 U.S. 214, 225, 106 S.Ct. 507 (1985)). "University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation." *Id.* (citing *Ewing,* 474 U.S. at 225, n. 11, 106 S.Ct. 507). "Courts must also give deference to professional academic judgments when evaluating the reasonable accommodation requirement." *Id.* (citing *McGregor v. Louisiana State Univ. Bd. of Supervisors,* 3 F.3d 850, 859 (5th Cir.1993); *Wynne v. Tufts Univ. Sch. of Med.,* 976 F.2d 791, 795 (1st Cir. 1992)).

In this case, there is no dispute that UC is a recipient of federal funds and may therefore

be held liable for violations of the prohibitions against discrimination in public accommodations imposed under the ADA and the Rehabilitation Act. The Court finds as a matter of law, however, for the reasons stated below that plaintiff has not produced sufficient evidence to support a finding that UC discriminated against plaintiff on account of a disability in violation of the prohibitions imposed under the Acts.

First, the Court finds that plaintiff has not come forward with sufficient evidence to create a genuine issue of material fact as to whether he is disabled so as to satisfy the first prong of his disability discrimination claim under Title II and the Rehabilitation Act. The Court will accept as true for purposes of the summary judgment motion that plaintiff has a reading disorder that impairs the major life activity of learning. The evidence of record, however, does not permit a reasonable finder of fact to conclude that the disorder *substantially limits* plaintiff's ability to learn.

In support of his position that the evidence does permit a finding to this effect, plaintiff relies on Dr. Layne's report, which plaintiff avers supports a finding that "not only is the Plaintiff limited in his reading ability in medical school, but also limited in his daily living." The specific findings on which plaintiff relies are Dr. Layne's findings that plaintiff's scores concerning his neuropsychological evaluation show "surprisingly serious neuropsychological problems," with (1) the Halstead-Reitan Index evidencing that plaintiff is below the first percentile of neuropsychological functioning and that out of roughly one thousand peers, only two or three are worse off, and (2) the less insensitive index, the Impairment Index, showing plaintiff as placing in the fifth percentile, with only four out of every 100 of his peers being worse off neuropsychologically. Plaintiff contends that in making his findings, Dr. Layne

20

compared plaintiff with members of the general population of all education and age levels, rather than comparing him specifically with medical students. Plaintiff argues that the case of ***Gonzales v. Nat'l Bd. of Medical Examiners,*** 225 F.3d 620 (6th Cir. 2000), on which defendant relies in support of its position that plaintiff's reading performance must be compared to that of "most people" to determine whether he is disabled, is therefore not relevant to this case.[2]

A careful review of Dr. Layne's report discloses that plaintiff's representation regarding the comparisons made by Dr. Layne is not entirely accurate. Dr. Layne expressly stated in his report that the specific indices referenced above "compared Mr. Brown *with other highly-educated 30-year-olds*." (Defendant's motion for summary judgment, Exh. B, p. 17). Accordingly, the Sixth Circuit's statement in ***Gonzales*** that the term "substantially limits" is defined in terms of the general population is relevant in this case. Consistent with the Sixth Circuit's analysis in ***Gonzales***, Dr. Layne's specific findings comparing plaintiff with other highly-educated 30 year-olds do not support a determination that plaintiff is disabled because they do not show that plaintiff is significantly restricted in the ability to learn as compared to most people or to "the average person in the general population."

Dr. Layne stated that he also compared plaintiff with people of all educational and age levels. Dr. Layne found that the more sensitive index showed that plaintiff was significantly below-average and the less sensitive index was low-average. These findings, considered in conjunction with plaintiff's academic history, do not permit a reasonable fact-finder to conclude

---

[2] In ***Gonzales,*** the Sixth Circuit upheld the district court's denial of a request for a preliminary injunction by a medical student with alleged reading and writing disabilities. Although the case was not before the Court on a summary judgment motion, the Court's dicta sheds some light on the appropriate analysis to be employed in determining whether a disorder "substantially limits" a major life activity.

21

that plaintiff was substantially limited in the major life activity of learning. It stands to reason that not every individual who scores below average or low-average on this particular neuropsychological battery can be deemed to be disabled, particularly since, as plaintiff's situation demonstrates, an individual can succeed academically through at least the college level despite scoring at the lower end of the range of scores on the battery.

In short, it is undisputed that plaintiff excelled in high school and college and was eventually able to achieve passing and above passing grades in the vast majority of his medical school courses. Certainly, this level of achievement greatly exceeds that which the average, unimpaired individual is able to attain, so that it is not reasonable to say that plaintiff was significantly restricted in the ability to learn as compared to "the average person in the general population." For this reason, and because plaintiff has not introduced evidence showing that his reading disorder has restricted plaintiff to any extent in any facet of his life apart from his medical studies at UC's College of Medicine, the Court finds as a matter of law that plaintiff's learning impairment does not constitute a disability as that term is defined under the governing law.

Assuming that plaintiff's learning impairment does constitute a disability and that plaintiff is "otherwise qualified" to continue as a medical student, the question then becomes whether UC breached an obligation to make reasonable accommodations to plaintiff. UC contends that its obligation to provide plaintiff with accommodations never arose because plaintiff did not inform UC of his request for an accommodation until after his appearance before the Academic Appeals Board on February 26, 2002, after he had finished his OB/GYN clerkship, after he had failed that clerkship, and more than a month after his dismissal based on failure of

the clerkship had already been recommended by the Promotion Board.  UC alleges that plaintiff's oral request for an accommodation after he had failed Medical School for the second time does not satisfy his burden of timely requesting an accommodation. UC further asserts that even if plaintiff's requests for an accommodation were timely, plaintiff did not follow the proper procedure for requesting an accommodation.  UC also claims that in addition to the fact that plaintiff never requested an accommodation, there is no other evidence that he is otherwise qualified to be a student at the College of Medicine.

Plaintiff alleges that he gave actual and constructive notice of his disability to UC in the spring of 1998 by informing his Preceptor and Supervisor, Assistant Dean of Student Affairs Dr. Air, that he had a reading disability, and by requesting tests because of his reading problem. Plaintiff further contends that he requested an accommodation on another occasion prior to his dismissal, which plaintiff asserts occurred on March 1, 2002, when he was notified of his dismissal by a letter from Dr. Hutton (Plaintiff's opposing memorandum, Exh. D).  Plaintiff states that prior to his dismissal, on November 1, 2001, Laura Wexler, M.D., Associate Dean of Student Affairs, had recommended plaintiff for a residency training program and was aware of plaintiff's difficulty with performing on standardized tests.  Plaintiff contends that Dr. Wexler stated in her letter of November 1, 2001 (Exh. E) that "[Plaintiff] does have some academic difficulty, particularly with passing standardized examinations.  Contrary to Stephen's difficulties, he is highly recommended because of his attitude, perseverance and his work by Dr. Wexler."

Plaintiff also points to Exhibit F to his opposing memorandum, the minutes of his appeal to the Promotion Board, as evidence that he raised the issue of a learning disability and that the

23

Board was well aware of his learning disability. The minutes state at page 4 that "In discussing his academic difficulties and his effort to a [sic] secure residency in Psychiatry, it has recently been suggested to [plaintiff] . . . that he investigate whether he might have a learning disability. Such a disability could be addressed and accommodated while he is in a residency, he maintained." Plaintiff acknowledges, however, that "[he] did not actually request an accommodation" from the Promotion Board. (Plaintiff's opposing memorandum, pp. 5-6).

Finally, plaintiff contends that the Court should not consider UC's argument that he failed to follow the guidelines for requesting an accommodation because there is no evidence that plaintiff was ever given a copy of the guidelines or that he had a responsibility to satisfy the guidelines.

The Court finds that plaintiff neither gave UC notice of his alleged disability nor requested any type of accommodation for an alleged disability in a timely manner. The evidence shows that, at most, plaintiff raised with Dr. Air the possibility that he had a learning disability that was a potential explanation for his academic struggles during his first year at medical school. At his deposition, plaintiff testified that he had "raised the possibility" of getting tested for a reading problem with Dr. Air and had informed her about his "difficulties with written tests." (Plaintiff's deposition, pp. 88-89). Plaintiff testified that he asked Dr. Air, "[D]o you think I may have some sort of reading problem, that I should receive some testing for that?" and Dr. Air responded that she did not believe that plaintiff should receive any sort of testing. *Id.* Plaintiff contends that whether or not this alleged request for testing in 1998 constitutes a request for an accommodation due to plaintiff's disability is a question of fact for the jury, but the Court disagrees. The onus was on plaintiff to obtain a diagnosis of a learning disability and to request

24

specific accommodations.  It was not incumbent upon UC and its agents to help plaintiff secure a diagnosis and fashion accommodations for him absent a specific request for same.  Plaintiff's statement to Dr. Air that he had difficulties with written testing and his query as to whether he should be tested for a reading problem were not sufficient, as a matter of law, to satisfy plaintiff's burden to notify UC of a specific learning disability and to constitute a request for an accommodation for such a disability.  Thus, plaintiff's comments to Dr. Air "simply did not impose an obligation [on UC] to offer accommodations."  ***See Kaltenberger,*** 162 F.3d at 437.

Dr. Wexler's acknowledgment in her November 2001 letter that plaintiff had some difficulty passing standardized tests was likewise not sufficient to put UC on notice that plaintiff has a learning disability and required accommodations to successfully complete medical school. In fact, Dr. Wexler's comments in a June 24, 2002 addendum to her letter indicate that plaintiff did not pursue a specific diagnosis and seek accommodations in a reasonably timely manner.  Dr. Wexler noted that plaintiff "only began to address [his specific difficulty with performing on standardized tests] in his final clinical year, after having to repeat Part I of the USMLE and remediate a number of his course and clerkship exams."  Dr. Wexler further stated that it was at the end of plaintiff's final year in medical school that he "sought professional help to address both his academic difficulties and some significant personal and family adjustment problems that he had been struggling with for many years."

It is undisputed that during his appearance before the Academic Appeals Board on February 26, 2002, plaintiff informed the Board of the diagnosis he had received from the Psychological Services Center, which was a "provisional diagnosis of Generalized Anxiety

Disorder" and a possible "Reading Disorder."[3]  It is not clear whether plaintiff requested specific accommodations at that time, although the report prepared by the Psychological Services Center, which outlined several recommendations for various accommodations based on the evaluation of plaintiff, was apparently available to the Board or was presented to the Board.  Assuming the Appeals Board was aware of these recommendations, it is clear that plaintiff did not disclose his diagnosis and the suggested accommodations contained in the report until after he had failed his OB/GYN course in October 2001 and after the Promotion Board had recommended plaintiff's dismissal.  It cannot be deemed reasonable for plaintiff to have waited until after he had failed this course and a recommendation of dismissal had been made to notify UC of a learning disability and to request an accommodation, particularly since UC had previously provided plaintiff with numerous opportunities to successfully complete his studies.  These opportunities included reinstating plaintiff to the College of Medicine after the Promotion Board had recommended his dismissal in 1997, allowing plaintiff to repeat his first-year curriculum, and permitting plaintiff to put his regular course work on hold so that he could study for the Step I exam.  In view of plaintiff's failure to timely request an accommodation, UC was not obligated under the anti-discrimination laws to provide plaintiff with these or any additional opportunities to successfully complete medical school at UC's College of Medicine.  Accordingly, there is no basis to interfere with the Promotion Board's judgment that  "[g]iven the record Mr. Brown has established over the last six years, it is the Board's view that Mr. Brown is globally unsuited to the practice of medicine," and with the judgment of the Appeals Board and the Dean that the

---

[3] The report states that plaintiff "appears to meet the criteria for a Reading Disorder as well."  (Plaintiff's deposition exh. 14).

Promotion Board's recommendation should be upheld. Because plaintiff failed to request an accommodation in a reasonably timely manner, plaintiff cannot prevail on his disability discrimination claim.

**B. Additional claims under federal law**

**1. Higher Education Act of 1965**

In Section V of his opposing memorandum, plaintiff references the EHA as constituting part of the Rehabilitation Act. UC has construed plaintiff's argument set forth in this section of his memorandum as presenting a claim under the Higher Education Act of 1965 (HEA), 20 U.S.C. § 1001, et seq. UC argues that there is no private right of action under any provision of the HEA because the only person who expressly has a private right of action under any provision of the Act is the Secretary of Education. UC notes that the provisions of the Code of Federal Regulations upon which plaintiff relies in support of his EHA claim deal with the Rehabilitation Act, which does not create a private right of action based on UC's failure to use federal funding to accommodate him, and that such claim falls squarely under the HEA, for which no private cause of action exists.

It is not apparent from either the complaint or his opposing memorandum that plaintiff is bringing a claim under the HEA. In the complaint, plaintiff invokes the Court's jurisdiction pursuant to the Rehabilitation Act, stating that UC "has accepted Federal funds for special training for graduate courses pursuant to 20 U.S.C. 1139 and 20 U.S.C. 1070(F)."[4] Plaintiff generally alleges in the complaint that he was denied benefits that were made available to individuals with disabilities, which caused plaintiff to be dismissed from the College of

---

[4] The reference to "1070(F)" is an apparent mistake.

27

Medicine, and that UC breached its obligations under guidelines established by the federal government to use federal funds for students with disabilities for post-secondary education. Plaintiff, however, makes no mention of the HEA in his complaint, and apart from the above-mentioned statutes on which plaintiff relies to invoke the Court's jurisdiction, plaintiff does not refer to any specific federal statutes in his complaint other than the Rehabilitation Act and Title II of the ADA.  Plaintiff does mention the HEA in his proposed conclusion of law No. 7, stating that he was a primary beneficiary of funds granted by Congress pursuant to the HEA, and that a private right of action exists when funds are denied.  Plaintiff also states as proposed conclusion of law No. 6 that he has a private right of action under § 504 of the Rehabilitation Act and 34 C.F.R. § 104.3(c).  Plaintiff, however, has not made a coherent argument in support of a claim under either that regulation or the HEA.  Accordingly, it is not necessary to determine whether plaintiff has a private cause of action under the HEA or 34 C.F.R. § 104.3(c), or whether he has come forward with sufficient evidence to create a genuine issue of material fact on a claim under either the regulation or the HEA.

 **2. Claim under § 1983**

Plaintiff invokes the Court's jurisdiction under 42 U.S.C. § 1983, which "by its terms does not create any substantive rights but rather 'merely provides remedies for deprivation of rights established elsewhere.'"  ***Radvansky v. City of Olmstead Falls,*** 395 F.3d 291, 302 (6th Cir. 2005).  A claim under § 1983 has two elements: (1) action by the defendant under color of state law (2) that deprived an individual of federal statutory or constitutional rights. ***Bloch v. Ribar,*** 156 F.3d 673, 677 (6th Cir. 1998) (citing ***Parratt v. Taylor,*** 451 U.S. 527, 535, 101 S.Ct. 1908 (1981)).

28

Aside from his claims under the ADA and the Rehabilitation Act, plaintiff has not set forth a claim for violation of his federal statutory or constitutional rights. In any event, UC argues that as a publicly-funded university, it is not a person under § 1983 and cannot be sued under the statute, and plaintiff does not dispute UC's argument. Accordingly, to the extent plaintiff has attempted to assert a cause of action under § 1983, UC is entitled to summary judgment on the claim.

## C. State law claims

Because the Court has determined that defendant is entitled to summary judgment on plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367(c).

## VII. Conclusion

In accordance with the foregoing, defendant's motion for summary judgment is **GRANTED.** Plaintiff's claims under federal law are **DISMISSED** with prejudice. Plaintiff's state law claims are **DISMISSED** without prejudice for lack of jurisdiction. This action is **DISMISSED** and is **TERMINATED** on the docket of the Court at plaintiff's cost.

**IT IS SO ORDERED.**

S/ Herman J. Weber
HERMAN J. WEBER
SENIOR JUDGE, UNITED STATES DISTRICT COURT

J:\HJWA\04-164adaPUB.wpd